in his official capacity as White House Deputy Chief of Staff at House of Ballots. Mr. McArthur for the ballots, Mr. Tobin for the appellate. Good morning, Mr. Oak. Good afternoon, Mr. McArthur. Good afternoon, Judge Gillard, and may it please the Court. The District Court in this case entered an unprecedented injunction that dictates the terms on which the White House must grant reporters access to the President in highly restricted spaces intended for the President's personal use, including the Oval Office and Air Force One. Because that injunction rests on a fundamental misapplication of the First Amendment and raises serious separation of powers concerns, the Court should stay the injunction pending appeal. I want to start out with what I think is the key legal error on which this injunction rests, which is the District Court's assumption that ordinary First Amendment forum analysis applies here as if we were dealing with an airport terminal. This Court in Price, echoing the Supreme Court in Forbes, instructed that First Amendment public forum doctrines should not be extended in a mechanical way to contexts that differ from those in which the doctrine has traditionally been applied. That is exactly what the District Court did here. Mr. McArthur, what is the best reason for not applying forum analysis? So, it seems to me, looking at the Supreme Court's cases, many of the cases that declined to apply forum analysis are cases involving government speech. But the government here is not arguing that government speech is at issue in the Oval Office. That's correct. I think this case does have elements of government speech, but we're not saying that it falls directly under that doctrine. To my mind, the best reason is because this is not a case in which someone is seeking access to a space. This is a case in which someone is seeking access primarily to a person. So, if you think about a classic case that's about access to space, take the Supreme Court's decision in Widmar v. Vincent. That was a case where the Supreme Court held that if a university opens its facilities broadly to student groups, it can't exclude a student group based on their viewpoint. It must admit all student groups, regardless of viewpoint, to use the facilities for their expressive purposes. Here, unlike the student groups in Widmar, the AP is not seeking access to, for example, the Oval Office, to use that space for some purpose of its own, independent of the president. They want access to that space because the president is there. They want to observe him in that space so they can record and report on what he is doing. So, I think that makes that fundamentally different than any sort of case in which the Supreme Court has addressed forum analysis. What's the finding of the district court that the AP is engaged in speech when it live streams, or sends things over the Internet, or editors, or blogs, or posts something from the Oval Office directly? Right. So, I think the district court's analysis there rested on a misapplication of this court's decision and price. The district court read price to hold that ordinary forum analysis applies whenever reporters engage in communicative activity on public property. That is just not what price holds. Price doesn't say anything like that. Price was about non-communicative activity. But price concluded that even regulations on non-communicative First Amendment activity that the government cannot discriminate based on viewpoint. There was no viewpoint discrimination at issue there. Right. Judge Henderson's separate concurrence is very emphatic that she joins because she understands the bar against viewpoint-based discrimination, even for non-communicative activity, to be unaffected by the court's holding. Right. So, that was the rule in that context. I don't think that rule applies in this context. I think if you tried to apply that rule in this context, it would be both over- and under-inclusive. If you're going to take the position that anytime someone is invited onto public property and is allowed to text their friends or take pictures and post them on social media, that means you can't engage in any sort of viewpoint discrimination. I think that's a rule that's simply not going to hold up. That would mean the president couldn't engage in viewpoint discrimination in deciding who he invites, say, to the State of the Union's address. There's a lot of case law elaborating on the line between public forum and non-public forum. I haven't yet found a lot. What's your best case, or how should I think about defining the line we need to talk about here, which is private forum and not a forum at all? Because if it's a non-public forum, you lose. I think that's right, Judge Katsas. I think our best case is obviously the Fourth Circuit's decision in Baltimore Sun, but I actually think we're in sort of a zone where there isn't precedent that speaks squarely to the question presented here, which is whether the First Amendment requires viewpoint neutrality when the White House is deciding whether and on what terms reporters are afforded access to the president to observe him in close quarters in personal spaces. I think you have to take this from first principles, and the first principle where I begin my analysis, and I think it's common ground undisputed, is that the president may consider viewpoint when deciding whether to grant an interview to a reporter or whether to answer a reporter's questions. That's why there's no First Amendment violation when the president invites Laura Ingram to the Oval Office to do an exclusive interview without extending the same invitation to Rachel Maddow. I don't take your friends on the other side to be disputing that. A lot of the briefing from the government has overtones of this is a very intimate space, the president, but there's no claim of security problem, of privacy violation, and it's in the hands of the government whether to authorize a press pool at all. And I don't take it that there's any dispute that at the time of the events in question, in this case, there was a press pool in place. So the notion that somehow the president's being forced to be observed by people he would rather not have there at all is just not this case. There's a dozen people there as a press pool, so he's agreed to have a press pool at that time, right? He has agreed to have a press pool, but I think that's begging the question. The question is whether he can, based on his assessment of reporters' coverage, exclude a news outlet from the press pool. Right. And you rely, you say, principally on Baltimore Sun, but to me Baltimore Sun is, and then Baltimore Sun says, it's about the government's own speech. It's not applying, it's not saying to particular members of the press, you can't call us. We won't interview you because of your viewpoint. It's saying to the, you know, I, the governor, don't want to speak to this person. I don't want my people who are my mouthpieces to answer the call either. And here there is no relief sought that would require the president or anyone in the Oval Office or Air Force One to answer questions from the Associated Press or speak to the Associated Press. So that seems to me the principal distinction between Baltimore Sun and your case. So I don't read Baltimore Sun, Judge Pillard, to rest on the government speech doctrine. What I read that case to say is that because there is this mundane and pervasive practice in the journalism industry of government officials either granting or withholding access to information from reporters based on its assessment of their coverage, that that is simply a place in which the First Amendment doesn't intrude. And that is ultimately what this case is about. They want access to information about what the president is doing and saying behind those closed doors. So you argue that it doesn't implicate the First Amendment to grant some journalists better access than other journalists. And one question I have about that position is that wouldn't that authorize the White House to just rescind the hard passes of journalists whose coverage the president dislikes, whose viewpoints the president thinks are unflattering? No, I don't think so, Judge Pillard. Our position is about access to the president in personal spaces, spaces that are set aside for his personal use. I take something like… Well, personal use in his role as the president. For sure. Unfortunately for people who are in high public office, the personal kind of fades away because they do so much that they're basically reduced to public figures. Again, no privacy, no security concerns. He wants to abolish the press pool. We'll hear from the other side, but I think he would be entitled to do that. But the question for you is really once there is this setting up this institution of the press pool, what is the basis for saying that there can be viewpoint discrimination? And I guess my specific question is if you're distinguishing between the Oval Office and other areas of the White House or other places that hard pass holders are welcome, what's the doctrinal basis for that? What's the Oval Office boundary line? Is there any precedent we could look to that would place the Oval Office, including when it's used for public events, public meaning, you know, outside people and governmental activity that would support that line? Right, so there's not a precedent, I can point to, just because I don't think there is a precedent that addresses this specific situation. But the line that I would propose to the court is to look to what the principal function of the space is. The Brady Briefing Room is a dedicated press facility. I'm happy to accept for purposes of this motion, this court held in Ateeba that that is a non-public forum to which a viewpoint neutrality requirement attaches. So I think you can put that on one side of the spectrum. For me, the thing that's on the other side of the spectrum is what I started to answer Judge Katz's about first principles is when the president invites someone for an exclusive interview in the Oval Office. Everyone agrees he can consider viewpoint when he does that. So those are for me sort of the two fixed points in which I try to situate this case. And I think the question is whether the press pool events in the Oval Office are closer to the exclusive interview or are they closer to the Brady Briefing Room? And I think they are much closer to the exclusive interview. I think it is only a modest extension of that idea that we are asking for here. What's the test? If I'm writing an opinion and I want to say Oval is different, does it include Air Force One? Does it include a Mar-a-Lago space? And how do I know analytically what your test is? I think the test would be is it a highly restricted space that is intended for the president's personal use. At least that I think is a rule. One of the uses is personal when he might have a head of state sit with him there or be signing executive orders and doing other matters of importance and interest to the government and the public. That's still his workspace. And whether you think of it as private or quasi-private or personal or proprietary forum, it's still very distinguishable from something that is set aside specifically as a facility for the press. But I think the key concept here is one of autonomy. Because if you ask the question why is it the case that the president can engage in viewpoint discrimination when granting an exclusive interview? I think ultimately the answer is that we all recognize that that is a matter of personal autonomy for the president, who he chooses to reveal his mind to. Mr. McArthur, you focused on the space, the type of space, the Oval Office, Air Force One. What about the nature of the press pool, which itself is a very highly selective or very small group of all hard pass holders? And I wonder if one analogy, it may not be a perfect analogy, is to Finley and American Library Association. Because in those cases, the Supreme Court said there's no forum in part because in Finley, artists are given NEA grants on a highly selective basis. And if that's government speech, they didn't say it's government speech, but they said because it's highly selective, it's not a forum. I do think that is an additional factor that you should consider here. So if someone at the NEA or a librarian in American Library Association can exercise discretion in a highly selective way of what books to choose or what Internet sites to allow in a library, would that principle extend to the president? I mean, I think the principle extends to the president in these private spaces where he has an interest in autonomy. So you would apply the same Finley standard to the Oval Office? Which Finley standard? Allowing the government to control how it supports speakers the same way as in Finley, to the same degree under the First Amendment? I don't know if it's to the exact same degree, but I think that strand of thought is implicated here. The reason I ask is because Finley explicitly says viewpoint-based discrimination is not allowed in that context. And here, there was a finding that the action was taken for viewpoint reasons, and I don't see anything in your papers or presentation that chooses to challenge that. It's clearly erroneous, nor on this record could you. No, we're not disputing that. So in Finley, what is your case that government, whether physical space or services like the second-class mailing in Cornelius, like copyright in Mattel versus TAM, what is your case that the government can either restrict access to public space or restrict benefits to which someone would otherwise be entitled? We don't force people to be able to express their viewpoint wherever they want. But if there's a program to which someone would otherwise be entitled, do you have any case that allows that to be conditioned on a recipient for a person seeking access on their viewpoint? Again, I don't have a case because I don't think there is one that addresses... Exactly. There is no case. There is no case that addresses one way or the other. Oh, there are many cases that say no. Now, this type of... Mattel and Finley and Cornelius and... This is one of the places where I think the district court went astray is simply assuming that all government property is created equal or even all government spaces in a given government building are created equal. I think First Amendment analysis should be flexible enough to pick up distinctions between things like the Oval Office and the Brady Briefing. If I'm applying your test for why the Oval Office is different, it's that it's a highly restricted space intended for the president's personal use. And not as a press facility. That is not a dedicated... And not as a press facility. That seems like a big... What you're saying is any place in the White House that's not a press facility. I mean, there may be other places in the White House that analysis would be different. You could look at, for example, the East Room. I think if you take the spectrum that I outlined earlier where you've got the Brady Briefing Room on one side, the Oval Office on the other, I think the East Room is probably in between those two. So, how does your test apply to the East Room? I think the East Room would still fall on my side of the line because... You could exclude people based on their viewpoint. That's correct. Hard pass holders. That's correct because that, again, is a highly restricted space whose function is to host events. Its function isn't as a press facility. And let me just give you an example here. I think it helps to make it concrete. So, one of the events that they are complaining about having been excluded from was a reception in February in honor of Black History Month that was held in the East Room. Under the rule that they are proposing and under the rule adopted by the court below, the White House could not exclude from that event a news organization that is validly a white supremacist organization because that would be engaging in viewpoint discrimination. Similarly, if the President decided to host the Prime Minister of Israel in the Oval Office, he could not, as long as he admitted other reporters to that event, he could not exclude a news organization that was validly anti-Semitic. That's why when I think about examples like this, the sort of government proprietary function idea does inform this analysis. There is a time and a place for wide open, no holds barred, all viewpoints represented coverage of the administration. And the White House has set aside a space for that. That is the Brady Briefing Room. They have their 30-hour passes. I'm not sure that you're characterizing the press pool's role the way the record and the district judge has found it to operate. It's not a hurly-burly forum with all viewpoints. The press members of the pool are, I think the district court found, 20, 30 feet away. They're not particularly interacting. They're observing important events, and they want to observe, but they don't particularly interact. In fact, the discrimination here was not of a viewpoint that the AP representatives expressed in the forum, unlike your example of a white supremacist potentially meeting with and shaking hands with honored guests at a Black History Month event. No, my hypothetical doesn't assume that they would be saying or doing anything in that situation. But I do think that is a time and a place in which the White House ought to be able to make that sort of judgment, that they shouldn't be present at this event. Because I think this is different from the Brady Briefing Room in the sense that the White House is trying to get out its own message. But you've disavowed that this is government speech. I don't think it's a pure government speech case, but I do think that strand of thought informs how you should think about it here. Because in settings like this, I do think they should have greater freedom to curate the message and to select a highly select group of reporters who are going to be in that space based on the degree to which they think those reporters will help amplify the message that the White House is trying to get out to the public. Ms. McArthur, you said that the AP is not engaged in communicative activity when they're inside the Oval Office. So how should we understand what they're doing? Should we understand it as news gathering? If I said that I misspoke, the district court found that they were engaged in communicative activity because they could send essentially in real time things out like texts and pictures. But I really don't think anything turns on that analysis here. I don't think the analysis would be any different if the rule in the Oval Office were no Internet. You can come in, you can observe, you can take notes, you can take pictures, but you can't transmit anything until you leave. I think if that were the rule, they would be making the exact same claim, we would be making the exact same defense. So I don't think anything turns on that. But I do think we are not restricting their ability to communicate, or at least we're restricting it only in the sense that we are denying them access to information. So that's what I'm wondering, though. So putting aside the access to the Internet, if they're just observing and there's probably no communication, and then they're doing something like news gathering, is that activity, does that activity have any First Amendment protections? Yes, I think that is what this court in Price talked about as sort of a pre-communicated step in the creation of speech. I think it does have, it is First Amendment protected activity. So to agree with the government's position here, would we have to say that news gathering is not covered by the First Amendment? Not at all. Not at all. I think you would have to say that in these particular circumstances where you're talking about access to a space that's in the president's immediate periphery, that his interest in autonomy, just like in who he reveals his mind to, override any First Amendment interest in access to him to observe him up close, personally, and record what he is doing and saying so that you can later report it. They can't force the president to answer their questions just because— And they're not claiming that they have any right to force the president to answer their questions. That's right. very exhaustive security examination, or that they have any right to say anything disruptive or distract him from his work, or that they have any right as the press pool as a whole to be invited at moments when the president wants to concentrate on his writing and his work. So it's a little unclear to me when you say a right of autonomy, I think the Oval Office suddenly seems like a place of silent retreat, and it's clearly not. I mean, he has a private study, and as I said, he can exclude people when he thinks his autonomy so requires people as a whole, but not based on viewpoints. So I guess I'm trying to understand the connection between the claimed prerogative to do not exclusion of humans or members of the press, but of people because of their viewpoint. How is that more challenging to the president's autonomy than just the ability to say nobody today at all? Because the president has speech and associational rights of his own, right? And so if you're looking at can the president decline to answer any questions from the AP, because he disagrees with the AP's editorial choices, everyone agrees the answer to that is yes. The question is why? I think the answer is because the president has autonomy over his mind and who he chooses to reveal that information to. Is the same thing true of a mayor and a governor? I think the same thing would be true of other government officials. On this point, yes. When you're talking about what's in their mind and whether they have to reveal that to someone or who they admit. Nobody's saying that the president has to reveal anything he doesn't want to reveal. It's only about whether somebody is allowed, when the president decides we're going to have a press pool, allowed notwithstanding viewpoint to be a participant in that at the times when the president chooses to have the press pool present. What I'm trying to explain, apparently not very successfully, is that it's the same principle. The same principle that says the president can consider viewpoint in deciding to whom he discloses his mind should apply to this adjacent situation of whom he admits to his immediate periphery in private, personal, proprietary, whatever adjective you want to use to describe it, those sorts of spaces. He has associational rights just like he has speech. A couple of questions. Why did you resist the government speech case line, which seems to be very helpful for you? This notion of autonomy, I mean, you're sort of talking about autonomy and associational rights because you don't want to say what the most important interest here is, which is the president's speech projected through journalists to the public. Well, I think the projected through journalists probably takes this out of at least the heartland of the government speech doctrine. That's what the district court said below is that the communicative activity that the reporters are engaging in in the Oval Office is their own speech, not the president's speech. And I think, by and large, that's right. But the reason the president has. The reason why this feels different is because of the president's communicative interests, at least to me. Yes, and I do think that that is something that should inform the court's analysis here. But I also think the nature of the space and the president's interest in retaining control over whom he admits to those private spaces has to inform the analysis here. Because if you look at the Brady room in the court held, that's nonpublic forum can't viewpoint discriminate there. So if the president went over to the Brady room, I don't think he could now say all of you here are now my organs to get my message out to the public. And therefore, I'm going to exclude anyone from this room doesn't share my viewpoints. I think the nature of the space matters and helps inform where, when and where it is permissible to engage in that kind of discrimination to help get out the message that the president wants out to the American people. The nature of the space is also connected to the idea that the president in the Oval Office and Air Force One is engaging in government speech because the Oval Office, Air Force One are not places where other parties, journalists or other people have any expectation to be able to speak themselves. I think that is true. I mean, the president, whenever he speaks, obviously, he's engaging in government speech. But if you're talking just about sort of free communicative activity of observing what he said, says and does on Air Force One, I think that is a different sort of analysis that isn't pure government speech. Tell me what's wrong with this way of thinking about it. Focusing on speakers rather than places or maybe incidentally addressing places, but really focusing on speakers. There are two kinds of communication going on in the White House press pool event. One is communication between the president and the journalists. And one is between journalists and members of the public. And you can sort of separate them and say, OK, president communicating to journalists with you 100 percent, but the district court took care of that problem. Making crystal clear, the president doesn't have to engage with any journalist he doesn't want to engage with. Absolute discretion to pick who gets to ask questions and how he answers them, viewpoint based, whatever he wants. And then the other level, the other level of communication is the journalists are sort of their passive observers and then they are broadcasting out that feels a little less intrusive. You know, it's sort of like if we admit press pool to this argument, they have no expectation of speaking. You're here to observe and talk to the public. I mean, that's communicative. That's more communicative than the stuff in Price was. And that just doesn't. Implicate the president's speech interests in the same way. So I think I agree with that. Just catch us after that step. Once they've got the information, once they've got the information and they are deciding to communicate it out to the public, they are engaged in their own speech. But there is the intermediate step of whether they are going to be granted access to that information in the first place. That's what we were talking about here, because what we're talking about is not admitting them to the space and then preventing them from communicating. The question is whether they get admitted to the space in the first place so that they can collect and gather that information. And that is, I do think, very much the analysis of the Fourth Circuit in Baltimore Sun, where the court said it is a routine aspect of this industry that government officials grant or withhold access to non-public information based on their assessment of reporters' coverage. So in a way, maybe another way that might be useful for us to think about your theory is through the lens of irreparable harm. It sounds like you're saying there's sort of an economy harm to the president. Is that a psychic harm? How would we find such a phenomenon in law or in fact? Is it a factual question? I don't see anything in the case about association or affiliation, but it sounds like that is sort of a conceptual kernel of your argument today. I think it is, and I think it is an injury to the autonomy of the president. The same way I think you would experience it as an injury to your own autonomy if you were being forced to admit people to your chambers who you didn't want to have there. Oh, no. Nobody's forcing him to have a press pool at all. Right. And if I wanted to have a press pool, I mean, sometimes we have groups that come and visit us and they come and sit and talk to us. And if we invite them in, I mean, I assume many people have visited me in my official capacity whose viewpoints I don't share, possibly whose viewpoints I abhor. So, yeah, I'm trying to get I suppose the question is whether it would be an injury to autonomy if you were compelled to do that over your objection, just because you admitted one group of one particular ideological persuasion. Now, are you you're going to be compelled to admit to your private chambers some other group whose ideology you abhor and who you do not want there. I think you would experience that as an injury to your autonomy. And that is the exact kind of injury that we are talking about here for the president having to admit people to his personal spaces to observe him up close and personal. So what's the district court decision and injunction? It's quite explicit that it leaves open many different avenues for the White House to control who is in the press pool. It says it cannot be based on viewpoint, but recognizes that the press pool is highly selective and there could be many different reasons for including a particular, you know, journalist or excluding. So so in that context where the White House still has substantial discretion over who is part of the press pool, what's the irreparable harm? I think the irreparable harm is the inability to exclude people that the president wants to exclude because he disagrees with their viewpoint or their coverage and doesn't want them in his personal spaces observing. Just to be clear about the fact here, it wasn't even the AP's coverage. It was because their style book used words that the president didn't like to describe a certain body of water. It was based on their viewpoint, and I don't know that the president has publicly explained why that particular editorial choice bothers him, but it could well be that he doesn't trust this organization to report on him fairly because of that. And so that's not the news outlet that he wants to be in the Oval Office when he does have some interest in using those events in his personal workspace to get his message out to the American people. It just strikes me, and I think it was your brief that talked about the hurly-burly of the press and the pressure to be able to take it. It's a bit of a two-way street, you know, that the president is in a position in which there's a certain amount of hurly-burly and he is fairly required to take it. And the White House has created a space for that. Again, the AP still has the front row seat in the Brady briefing room. We are talking about different sorts of spaces where I do think the White House has a greater interest in curating the coverage to make sure that the message it wants to get out is being amplified by the highly select group of reporters that are being admitted to those highly restricted spaces. There is one other idea that we haven't touched on here. I mentioned it at the outset. Before you move on, on selectivity, I think it's something like 20 reporters in the Oval, 13 on Air Force One, something like that. But that's selected from a pool of eligible reporters. So how large is that? I haven't seen a number in the record. What I've seen is that it's 1 to 2 percent of the overall White House correspondent pool. So it is a highly select group. I mean, 100? Let's say it's 100. Should we think of this as only 10 or 15 get to go in at any one time because the physical space is small? But really it's a special level of access provided to 100. And 100 to me starts to sound more like the East Room event than like the one-on-one interview. So I think of it more in terms of the small group of 20 that's there at a time. But I don't only think that that distinction will matter. Again, I think the East Room falls on our side of the line because that's not a dedicated press facility. It's there to host events for the event's own sake. The press coverage that happens there is incidental to the primary function of that space. The one idea, I know I'm over time, but the one idea I did want to touch on here is in response to your question, Judge Pillar, about I think much of the analysis about the interests of a government official in autonomy do apply to government officials. But I do think there is an extra layer in this case because we are talking about the President of the United States and there are serious separation of powers concerns that I do think should inform how you think about this. Because a judicial decree forcing the President to admit individuals into the kinds of spaces we're talking about here does evince a lack of the respect due to a coordinate branch of government. And it invites litigation that will often turn on intrusive inquiries into the President's state of mind. And if you want a preview of what's coming, if you uphold the district court's decision, you need look no further than the motion to enforce that the AP filed yesterday after this injunction had been enforced for two days. They've now gone to the district court and said that we're in violation. They say they are continuing to be excluded based on their viewpoint. We say, no, it wasn't your turn. We put you back in the rotation, but it wasn't your turn on those two days. And those are the kinds of disputes that courts are going to be called upon to wade into. And this injunction doesn't do anything more than impose the sorts of obligations that the district court thinks that the First Amendment imposes of its own force. So you don't need an injunction to bring these kinds of claims. You can come straight into court and start micromanaging on a daily basis decisions that the White House is making about who gets access to the Oval Office. So, Mr. McCarthy, you talked about the government's interest in having its message conveyed through the press. And I just want to have a clear understanding of how you think that might affect the hard passes. My understanding is that the broader press corps has maybe a thousand members and they are on a more rotating basis allowed to RSVP for and get invited to certain things. And I assume they're all allowed to come to Q&As in the Brady Room. But under your theory, it's also the President's prerogative to issue or restrict, issue press passes based on the nature of the press coverage? I don't think anything in our position here touches the hard passes. No, it doesn't touch the hard passes. No viewpoint-based wedge in there. Yes, we accept that the dedicated press facilities in the White House, including the Brady Briefing Room, are, as this court held in Atiba, non-public forums to which a viewpoint neutrality requirement attaches. And therefore, I don't think you could exclude any reporters from that space based on their viewpoint. What about invitation? You mentioned, you know, topical events and whether people could be screened, not based on security, but based on viewpoints. So is it your position that the President also has the ability, for example, RSVP events? You know, who's going to come and heads of state are coming and meeting with the President, and he's allowing a certain number of members of the press corps to be present. Viewpoint-based screening permissible there or not? I think so, if we're on the same wavelength here, because what I have in my mind when you describe that is something like the East Room event that was held to commemorate Black History Month. I do think that sort of event, where it's by invitation, and they admit members of the press corps, is a time and a space where they can- President Zelensky or- Correct. Or any other head of state. Those could be viewpoint-based. Yes, if they're being held in these sorts of spaces. I see that I am well over my 13 minutes. If there are no further questions. Good afternoon, Mr. Tobin. You may proceed when you're ready. Good afternoon, Your Honor. Your Honors, thank you for the opportunity for the argument today. My name is Charles Tobin with the law firm of Ballard Spahr. With me at the council table is my co-counsel, Sasha Dutting. Your Honors, I wanted to just mention a quote that I had come across in preparing for this case. It's from Mark Twain. He said that, I think that's a point way to explain why we are so concerned that for two months now, the White House has brazenly excluded the AP from opportunities offered to other journalists in the White House, just because the AP's expression, as you all were discussing with my friend, government counsel, it's all about the adherence to the designation of Gulf of Mexico that the president does not like and expressly wants to control, and that the trial court correctly termed viewpoint discrimination under the law. Your Honors, the district court found that exclusion violates the First Amendment and causes the wire service irreparable harm, and it did the balancing of the interests, and it appropriately and very narrowly tailored an injunction. The order simply rescinds, orders the White House to rescind viewpoint discrimination violation of the First Amendment in providing the opportunities to the Associated Press offered to others in the pool or others invited to RSP. I'm wondering if you can respond to the point that Mr. MacArthur just made at the end, which is, if this court were to recognize that the president cannot discriminate on the basis of viewpoint for the press pool, but then the president reconstitutes the press pool for some other non-viewpoint-based reason, doesn't that just open up the White House to pretext claims on the basis of viewpoint and lead to a problem where the courts are going to be micromanaging the decisions of the White House as to who can be part of the press pool? Your Honor, the answer is going to be the lawyer's dodge. It depends on the facts. It will depend on what the White House articulates as the reasons for the new selection criteria. If it's security, it's already happened. They've issued a new policy. It's viewpoint neutral on its face, and you're running into district court to enforce this injunction. We were told we have a verit in the injunction in the motion to enforce papers, and I might add, the judge very quickly set a hearing for tomorrow, so prima facie, whatever we put in those papers was of enough concern to have a busy judge. But I'm happy. We're not going to constantly be micromanaging. I'm happy to answer your question, Your Honor. What the White House did in the new policy, just to go there first, is it said that the overarching rule is that the president retains absolute discretion over access to the Oval Office. That's exactly the type of issue that was before the judge previously, and the judge said the president's discretion is cabined by the First Amendment. So that answers the main concern that we're going to argue tomorrow with the judge in terms of other criteria. That was a poke in the eye. No doubt about it. But the new policy on its face is viewpoint neutral. But I would disagree with that with all due respect, Your Honor, because if it says, here's all the viewpoint neutral reasons. The criterion of exclusion is no wire service. But the president reserves absolute discretion and within absolute discretion has to live viewpoint discrimination or else there is no discretion. So then a court needs to say the president does not have absolute discretion? Court needs to say the president's discretion is cabined by the Constitution, an issue that's obviously playing out in many different cases in this courthouse today. The president of the United States does not have absolute discretion to violate the Constitution. And the district court found after two hearings, one of them all day, listening to two Associated Press witnesses, the White House choosing not to bring a witness to explain their criteria. After finding there was a contradiction between the White House's written explanations in the declarations, one declaration said that we were eligible for admission. The other declaration said we would not have admission. Counsel was asked by Judge McFadden, what do you mean by eligibility? And his answer was, well, I'm eligible to play for the Washington Nationals, but they're never going to accept me to play. And the president is not going to let the Associated Press in because of its viewpoint. And so I'm sorry, Your Honor. Suppose it's the same policy without that poke in the eye sentence at the end. We're just eliminating the wire service, replacing the wire service seat with something else. Your Honor, there's also discretion allowed for the White House press secretary. And with respect, Your Honor, these are fair questions for me to be asked. But they're questions that we should be resolving in the district court because this particular policy. Day to day, the district judge is going to be probing the motive of senior White House aides, if not the president himself. If a White House aide tells one of these reporters you're not getting in because of viewpoint discrimination, I would suggest that they have every right to come to the court and to say that we have a constitutional problem here that the court needs to address. If you have the appropriate evidence, Your Honor, you should bring a claim in court. Everybody has the right to do that. We did not willy nilly bring a claim here. We put before the court abundant evidence, undisputed, largely undisputed, two witnesses all day filled with testimony. And the court came to the correct conclusion because the White House has conceded that this is all about trying to control the message, trying to control the viewpoint, if you will, of the associated. There are a series of presidential immunity doctrines not directly controlling here, but built into every one of those doctrines is that courts can't probe the motivation of the president because that would be debilitating and inappropriate. That's what that's what has to happen here. Well, if that's becomes the rule, then the doctrine of viewpoint discrimination will no longer apply to the president. And we know clearly that it does apply to at least the White House. I might add, we didn't sue the president because of the carve out. I believe it was the case where I think it was Judge Tatel said one of the judges said you can't sue the president. So the injunction was not enforceable as to the president, but it was enforceable as to the White House. I mean, the White House is broadly or narrowly. I mean, but the case did did apply to the White House. And it did say Karen says it. A tape is the most recent case that says it. Cheryl is the progenitor case that says it. Price doesn't say this to the White House, but it says it in general. It stands for the proposition that viewpoint discrimination, even in the White House. It says courts will courts will police viewpoint discrimination for something like the Brady group. Well, I was very different. It's what makes it difficult is this president's old position that he can discriminate because of viewpoint. I take I take your point on that. And, you know, the first iteration of this case was very easy, factually, because White House was quite open about that. But the legal principle that the district court has established here is not in any obvious way cabinable to cases with smoking gun direct evidence. Well, it's cabinable to cases where the president exercises viewpoint discrimination or reserves to himself the right to exercise viewpoint discrimination. If you were to declare tomorrow that I'm going to exclude any press that doesn't report that the tariff policy of the United States is wonderful. That's viewpoint discrimination. And any journalist who's excluded on that basis should and would have a right to bring a claim. I mean, it's one thing to just talk about viewpoint discrimination generally, but we do have to focus specifically on what type of activity is occurring. I mean, I think the AP concedes that if the president were to schedule a one on one interview or even a small group interview, he could he could choose journalists based on viewpoint. That's correct. Right. And so I mean, the real question is we were discussing your friend on the other side is where this falls along that continuum. Right. This is not the Oval Office is, I think, but obviously not the Brady press room. And the press pool is not exactly like a one on one interview because members of the press were not interacting with the president. But I think you have to say why this is more like the Brady press room than like a one on one interview. When you're talking about 10 or 12 journalists who are in the president's office or in the president's airplane or in his home in Mar-a-Lago, why is that not more like a one on one interview? Because, Your Honor, it is part of an established system. I think you asked the question, what about the pool itself? There is a system established called the pool. The White House has decided to accede and now control that system, take over the selection. Once you have a system called the pool or whatever you want to call it and you invite on a daily basis, members of that pool to come in and observe and in real time report out the news that's happening in the White House. And you're not interacting with the president. The purpose is not for an interview, whether it's one on one or two on one or three on one. It's to observe and report. That's exactly where the distinction lies. And that's what the district court found. The court itself asked questions of my witnesses, the AP's witnesses, in order to draw out that distinction. But the pool doesn't have any kind of mythical status. I mean, presumably presidents have a press pool for their own purposes, for their own reasons in terms of how they want to get their message out to the American public. And presumably a White House president could constitute a press pool in any way that they thought was useful. Your Honor, I would just point the court to the other settings in which a press pool and the words press pool appear in all of the decision have been found to be bound by the Sherrill doctrine, the hard pass holder doctrine, which is there is no viewpoint discrimination, only allowance for neutral, reasonable criteria. It's just a narrow subset of hard pass holders. That's correct. I mean, a very small set, right? I mean, there were some 1,500 hard pass holders, something like that? 1,300, Your Honor. And they're, you know, a fraction, 1% of that in the Oval Office? Right, Your Honor. But they are selected on it, have been selected, and are still selected under the new policy ostensibly on a rotating basis by entity, not by reporter. And, Your Honor, that's the system that... And not by viewpoint. And not by viewpoint. Well, ostensibly not by viewpoint. Okay. But that's an issue that the district court found against the government on in the previous iteration of the policy. Let me ask you about just sort of the underlying doctrine that we're working with here. We have traditional public fora. We have limited or designated public fora. We have non-public fora, and the district judge in this case held that the Oval Office and Air Force One and the relevant part of Mar-a-Lago is a non-public forum. Are there some types of government property or some uses of government property that are not forums at all? And how do we think about that for First Amendment purposes? Yes, I think Judge McFadden answered that in denying the stay, the extended stay that was requested. So, for example, the president has a private office, a smaller office off of the Oval Office that he retreats to. The court found that that is separate and distinct from the Oval Office when it's used for press spray purposes. The president's suite in Air Force One... I guess I'm still trying to figure out what work the forum, even non-public forum designation is doing, because there are broader doctrines about people who would otherwise be eligible, cannot be excluded, denied, deprived of the thing for which they're otherwise eligible based on viewpoint. And I'm just trying to understand... Presumably that does not apply if the president wants to convene a meeting of, you know, even if it's going to be in the... let's say he uses the press room as the space, but he wants to have a meeting of experts on the criminal justice system, and he really only wants people who are oriented to reducing mass incarceration. Can the president, in that kind of situation, you know, it's a public space, invite people to the meeting based on viewpoint? Or, I mean, there's language in some of the cases, like Cornelius and Price, that say identity of the speaker and the content related to the event, but it seems to suggest that viewpoint discrimination would be barred, but I find that hard to accept that that would be true. What's your view? Help us out on that. Well, if it were a designated pool event, if it were... No, no, no, I'm not talking about the press pool. I'm talking about a meeting. And if the president wants to convene a meeting, he can invite people to the meeting based on viewpoint. He can invite thoughts. I'll just pick a logical... He can invite... I'm not even talking about press. That's correct. People who are specialists, who are corporate leaders, who are professors, who are engineers, whatever. So that kind of convening, it can be based on viewpoint. And that's because it's not even a non-public forum. It's not a forum at all. It is not a public forum in the sense that it is not a place open up for First Amendment protected activity. The reason the Oval Office is a natural extension... It's not even a private forum, though. It's not even a non-public forum. At that point, it's not a forum... It is a non-public forum in the sense that there's no activity there. It's non-public. It's subject to a prohibition on viewpoint discrimination. So he wants to have an event in the cabinet room and invite... He has some policy in mind that he cares a lot about. And he wants to invite members of the public and press who support the policy. And only people on that side of the issue. Can he do that? Not if it is selecting from among the hard pass holders report of the press pool in the White House. If he is inviting... And I thought that's what Judge Pillard was asking me. But he's inviting one favorite journalist in to sit down and witness a cabinet meeting or something like that. I would say that's probably closer to an individual selective interview than it is a press pool event. No, he's inviting... He wants to develop the case for, I don't know, higher tariffs. And he invites union leaders who support higher tariffs. Academics who support higher tariffs. Public intellectuals. And they're doing an event. They're doing a give and take in the cabinet room. Totally viewpoint based. Is that okay? Yes. I mean, that's the development of discussion among leaders in developing policy. It's not a communicative activity. But then... So those are the people at the table. But then they want five... He wants five press people kind of on the chairs and back at the edge. But he can't discriminate based on viewpoint for the reporters. I think once he's... If he goes out... If the White House press secretary were to go out and tap people on the shoulder and say, President wants to talk to you. Come on into the Oval Office. And it's a small group of people. I think he's perfectly entitled to do that. Once you designated a pool event, once you have a system, which we discussed a minute ago, of rotation, that's where the entire notion of viewpoint discrimination becomes an anathema. And the court got there by the analysis, by analogizing this to the non-public forum setting. I personally think it's closer to a limited public forum in that setting. Real rotation in the pool. I mean, the AP is concerned that it used to always be part of the press pool. It's not rotation. I mean, you're making it sound as though... I mean, if they were in the natural rotation, then they would... Of hard pass holders or organizations, they would rarely be in the Oval. Well, we were happy to have the White House recognize the unique role that the AP holds, both historically... But that's not a First Amendment. No, but I am trying to answer your question, Your Honor. We were happy to have that. I would not stand here and argue that we have a right to be the line leader. And I said that to Judge McFadden. We were pleased that we were, but now we're completely shut out. We're not even in the rotation. At least we weren't in the record before the district court. I'm not convinced that we are yet, but that's an issue I want to work out with the district. Also, I'm interested from AP's perspective. What is the communicative activity that AP or any other member of the press pool is engaged in when they are watching or observing events in the Oval Office or airport? Sure. I have two answers to that. One's in the law and one's in the facts. Under the law, the Sherrill Doctrine, which the district court did apply in this case, the Sherrill Doctrine is that the press and public have an interest protected by the First Amendment in ensuring that restrictions on news gathering are no more arduous than necessary. So that was a question you asked my friend on the other side earlier. What is this news gathering all about and what are the definitions? The law in this circuit protects news gathering. News gathering means both developing the information and taking it in and communicating it out. Granted, news gathering has some First Amendment protection, but is it communicative activity? That's where the facts themselves come in. Because the clear record in this case is that what's going on from the White House is live reporting both by photograph and by text and dot com means. The reporters for the AP are reporting live from the White House. We all get push notifications from the AP. So does that turn any government space in which a reporter or anyone else, and I think Judge Katz has asked a similar question earlier, any space, any government space where someone has a cell phone and posts something on their blog or whatever, makes any kind of communication to the outside world, then that's a non-public forum? Does the Internet transform all physical spaces into non-public forums? I would narrow the limited principle by saying that anywhere the government opens up for news gathering, certainly if there's an affirmative act, the answer has to be yes. And here there's the affirmative act of inviting the press pool into the Oval Office to observe and report out in real time the news, and that makes it a protected First Amendment. Open the forum, not necessarily specifically for communication, but for news gathering. And part of that includes accessing the Internet, not communicating in the forum directly. Not communicating with the people staging the event. Right, well, because the traditional all-fora analysis stems from the traditional public forum, parks, sidewalks, things like that, where the forum and the speech are intimately connected. But where communication exists only on the Internet or, you know, through electronic transmissions of some type, there's no connection between that type of electronic transmission and, say, the Oval Office in the way there is between a sidewalk outside the Supreme Court where someone might want to picket the Supreme Court because they don't like a particular decision. So there's no connection. In all the fora analysis, there's always a connection between the communication that people are aiming for and the type of forum. You know, a charity wants to be part of the capital campaign so they can get their message out to government workers in Cornelius or something like that. All the traditional public fora cases are like this. So here there's not the same connection. But that was the rule. That was the same, broadly speaking, set of facts in the Cheryl B. Knight case, which is access to the White House in order to be able to report information, to gather the news. And the circuit did find that there was, and reaffirmed it in Atteba and in Karim, that there was a First Amendment interest in that news-gathering activity. News-gathering in the press room. Didn't say that. Karim arose out of the Rose Garden. Atteba arose out of the Brady Press Room. Cheryl arose out of getting into the White House at all. And the same doctrines applied across all three. And there is no— I think those are identical to the president himself inviting a small group of journalists. Inviting a designated pool in which is supposed to be a rotating system, if you're going to agree with us that it has to be non-discriminatory, non-viewpoint discriminatory. Yes, you're right. So that seems the strongest part of your case. There was a pool. There has been a pool. And whether you look at the Knight Institute, which dates back to 1881, or you look at the National Journal Declaration that you filed in the district court, dates back to the 40s, there has been a press pool, and it has been a non-viewpoint-based opportunity for the press. If the fact of this case had never occurred, and the president had just decided he wants to abolish the press pool entirely. Let's just not have anybody coming into the Oval, any members of the press on Air Force One. First Amendment problem or no? I would need to understand a little more facts, and namely I need to know what it's replaced with, and I need to— No reporters in those places because the president feels his autonomy would be hampered. He doesn't want to associate with journalists who he finds pesky. I think it would be a tougher argument under Zemel versus Rusk to say that the president couldn't exclude the press entirely from the Oval Office or even the White House. I want to know a little more about the facts. I want to study up on that a little more, but my answer standing at the podium is that the district court got the limitations correct, that the president can't be ordered to speak to somebody, the president can't be ordered to hold a press event, but once he decides to do those things in a pool setting, in an established pool setting, he can't do it in a viewpoint discriminatory way, and I just wanted to just point the court out to four other settings where the district courts, the federal district courts, have each said that a pool setting in areas that may be counterintuitive to all of us, embedding with the military central command in Gulf War I, Nation Magazine versus DOD in the Southern District of New York, the press pool had to be selected based on non-viewpoint discriminatory reasons. Flights to Guantanamo Bay, where the press were invited and there were only 20 seats, that was in this courthouse, Getty Images, News Services versus Department of Defense, those 20 seats had to be selected on viewpoint neutral criteria. The Congressional Press Galleries, also in this court, Consumers Union of the U.S. versus the Periodicals Correspondence Association, also I said in the district court here, and then the White House pool itself was adjudicated by the Northern District of Georgia in 1981 in CNN versus ABC Inc. as a form in which you could not have discrimination based on viewpoint when they were trying to exclude all of the television stations from the pool. Those are four areas, and the fourth one actually supports very directly the district court's reasoning in this case, but those are areas where you might have some real problems if you're looking at this fresh until you start to apply the notion that viewpoint discrimination is anathema, and once you open up an area to a group of people. Well, this is basic to us, basic fundamental American doctrine, Your Honors, and we would ask the court at least not to stay. We'll obviously have a more fulsome argument if the government proceeds with its appeal. We do have issues to sort out with the district court, but in terms of a stay, they have not sufficiently established the grounds that they need. So, you conceived the one-on-one interview, right? So, why is it then, what is the doctrinal basis for saying the president wants to open up the Oval Office to bring in a journalist to project his views? If it's one-on-one, he can do that on a viewpoint-based criteria. Why can he do that? That's Baltimore Sun v. Ehrlich, which was my case, Your Honor. I had the privilege of arguing that case in the Fourth Circuit. In Baltimore Sun v. Ehrlich, the court held that there was no First Amendment right to demand a one-on-one interview with the president. Therefore, the president could be selected. How about five? If he goes out- Just five favorite journalists. If he goes out and taps them on the shoulder and says, come on into my office, that was part of the fact pattern in Baltimore Sun v. Ehrlich. Press secretary for Governor Ehrlich did exactly that with one press gaggle briefing in a small conference room. This is fundamentally different, Your Honor, and we think that Judge McFadden got it absolutely right in that this is- He says he's starting from the full pool and then subtracting rather than- Starting from the full pool and then discriminating based on viewpoint. Rather than just adding- If he just goes down the list, he keeps a list of reporters he likes and doesn't, and goes down and- All right, there are 20 seats in the Oval. I'm calling in my favorite 20, and not surprisingly, that's a viewpoint-based judgment. That would be a violation under Sherrill v. Knight and all of the other cases. To do it as a way of narrowing the pool, if he did it just by calling people up- He's just picking his favorite- Then he's not excluding people. He's inviting- One, three, or 20. Then he's not excluding people. He's inviting people, and the doctrine- He can invite his favorite 20 journalists into the Oval on a viewpoint basis. Yes, Your Honor, so long as he is not staging it as a pool event. He can do individual events like that, and Your Honor, I can't do any better- It's awfully close to what's happening here. Well, I can point to, just as persuasive authority, the State Democracy Defenders brief that was filed in the district court as an amicus brief. Twenty-three former office holders, some of them former press secretaries to the White House, many of them in the current president's party, one of them, Judge Ludwig from the Fourth Circuit, who was on the panel that voted against Baltimore Sun and Ehrlich, and all of them have drawn a sharp distinction between, as Judge McFadden did, based on the record evidence of my reporter's testimony, that there's a fundamental distinction in the way the White House operates between holding a pool spray type of event and inviting reporters in one by one for individual interviews. May I ask you two more, just to try to pin down what's doing work and what's not? Same analysis, trying to take out the access dimension from the speak with the president dimension. He's picking journalists who will be not allowed to speak with him, but just follow him around and observe him in order to write articles. He can do that on a view- He can pick- Same idea. Yeah, sure. He can pick a couple of people and say, follow me for the day. Absolutely. And another one tests whether retaliation works differently from forum. He has a one-on-one scheduled with a favored reporter. That reporter then says something the president doesn't like, and the president cancels the interview because of that, because of the statement. Is that permissible? Or is that- It's viewpoint-based retaliation, but in the president's intimate association with journalists. The retaliation has to be an incursion into a First Amendment right held by the plaintiff in the case. In the case that you just posited, I don't think the journalist had a First Amendment right to be invited to the one-on-one interview. And so the president's cancellation based on not liking what the journalist said doesn't incur into their First Amendment right. If you just mechanistically apply the elements of First Amendment retaliation law or unconstitutional conditions law, it doesn't matter that he didn't have that right in the first place. If he's being denied a benefit for a bad reason, that's unlawful retaliation. And yet, we still have this instinct, like of course he can cancel that interview. And my instinct is the same as yours. So why is that? I come at it from the facts of this case First Amendment standpoint. The First Amendment applies here because there is a public forum that is designated from time to time for pool opportunity, I'm sorry, a government office that is designated, a non-public forum from time to time for press opportunities on a rotating basis by the pool. A First Amendment right attaches to those opportunities, number one. Number two, my reporters are part of a press pool for being denied opportunities for retaliatory reasons, and that attaches, that attacks their First Amendment right to gather news under Cheryl versus night in a setting in which they possess a First Amendment right. That's what distinguishes it from the one-on-one interviews. And I would urge the court to look no further than the State Democracy Defender's brief, just end my reporter's testimony for the factual record of why those are fundamentally different things. Thank you. Thank you, Your Honor. Thank you. Thank you very much. Mr. McArthur has reserved two minutes for rebuttal. Just a few points to your question, Judge Pillard, about the longstanding existence of the pool. The thing about forums that are created by the government, if they can be clawed back, President Trump is under no obligation to run the press pool the way his predecessors did, or even the way he himself did in his first administration. If he wanted to reconstitute the press pool as his 20 favorite reporters, which I heard my friend on the other side to concede, he can do that. And I think that concedes the case, because if he can make it 20 that he most prefers based on their viewpoints, he can certainly exclude one based on viewpoint. To the line of questions about where this case sits in public forum existing case law, it doesn't because there is no case addressing a space like this one in the president's immediate periphery in a highly restricted space. This space is not like a polling place. It's not like an airport terminal. Just to be clear, this space, you're talking about the Oval Office, but also Air Force One and also the Mar-a-Lago space? Yes, I think the Oval Office is sort of the paradigmatic one, the focus of the case, as Judge McFadden said, but I think the principle applies to the other spaces as well. Whether you think of it as simply not a forum at all or as a different kind of forum, we need a new box for this. I tend to think of it as something like a proprietary forum. It doesn't fit within the existing case law on forums. What do you mean by proprietary forum? I mean, it's a zone of discretion where the president gets to choose, including based on viewpoint, who he admits to those spaces, just like he gets to choose based on viewpoint, who he discloses his mind to in answering questions or giving an exclusive interview. Although the case doesn't fit in the forum cases, I do think it would be a mistake to too hastily dismiss Baltimore Sun. That case was not about government speech. Read it carefully, Judge Hillard. There's a part at the end that's about government speech that addresses a comment the governor had made. The heart of the analysis in the case, the court conceives of as denial of access to discretionarily afforded information. If you give information to some reporters, you have to give it to others. That is what this case is about. They want information about what is happening behind those closed doors with the president and his guests in those restricted spaces. Isn't that sort of circular? Because there everybody agreed that it was discretionarily afforded because a government official doesn't have to return a reporter's phone call and a government official has complete discretion on who he or she invites in for an interview. That's why that was discretionary afforded, whereas you're a little bit bootstrapping or arguing in a circle if you say, well, here it's discretionary, whereas in fact the courts and the press and the White House have understood the pool not to be discretionary in the sense that it really entails government speech. Or just putting that aside because I understand you dispute that, they have not seen this as a place where the White House has discretion to pick and choose based on viewpoint. And so I'm not sure what the discretionary... Whether they've seen it that way or not, what I'm saying is... ...gets you except to assume that you win and then say that you win. I don't think it's assume that I win. What I'm trying to say is it's the same principle. The same principle whereby a government official doesn't have to answer questions from reporters whose coverage he doesn't like should be modestly extended to cover this very analogous situation of do you have to admit someone to your personal space to observe what you are saying and doing there so they can report on you just because you've given that access to some other reporters. And the key insight I think from Baltimore Sun is that this is routine in this industry and that should inform how you think about the First Amendment. The court said government officials frequently and without liability evaluate reporters and reward them with advantages of access. But Mr. McArthur, if you go by what is routine in the industry, what is routine in the press pool and the press corps is actually quite different from what is routine in answering phone calls or inviting individual or small groups of journalists in for conversations with a public official. So what is routine actually cuts against you. Let me ask you, is it the government's position that the president has abolished the press pool? No, I don't think he's abolished the press pool. No, he hasn't. Just one final point if I may. Judge Katsas, I did not hear an answer to the question of how you can cabin this legal principle so that we aren't going to have constant inquiries into the president's state of mind about who he is choosing to admit to these spaces. And again, this is precisely what the court in Baltimore Sun warned against, that if you accept this principle, you are going to plant the seed of a constitutional case in everyday interaction. I am worried about that. But let me give you a couple of competing considerations. To me, these are harm points. One is, you know, we've seen a lot of cases lately where the executive branch is claiming interim harm to support stays. Many of them involve injunctions that direct how the president performs official duties, recognizing inferior officers, spending money. We don't have that here. It's dignitary in a sense, but it's more abstract in that sense. And then, you know, in terms of what's going to happen in however long it takes to adjudicate the appeal on the merits, it no doubt will stick in the White House's craw, but it is the same arrangement that people have been living under. And the merits point that he can claw it back is maybe a little bit different from the harm point that, you know, this will not imperil the presidency if it persists for a few months or however many months while the appeal is pending. So I do think it is a species of dignitary harm, but I would not minimize it. I do think it is a serious dignitary harm. It is not far off from a judicial decree ordering the president to answer a specific reporter's question. It's so interesting to me that you make that argument. The record in this case really edify in the sense that during the Watergate period, the press pool was right in there with President Nixon. During the scandals with President Clinton, the press pool was right in there. When various presidents were ailing and dying, the press pool was right in there with them. And this is the tradition when you talk about what's routine in your reference to Baltimore Sun. To me, I mean, I found that really impressive that we have a First Amendment that enables that kind of observation of our chief executive. And to me, that does affect the claim of irreparable injury that's made here. So I think what is routine, what the Baltimore Sun court said is routine is government officials choosing who they give access to information to based on reasons of their own, including their assessment of the coverage. Who they themselves are willing to speak to. Or to give information to. I don't think it was just about answering questions in Baltimore Sun. It was about giving information. And it was a far more exclusionary policy than what we have here. The governor had said, everyone in the executive branch can't talk to or give information to these two reporters. And so what the president has done, has taken that routine aspect of this industry, where there's jockeying for access and granting of information based on assessments of reporters and their coverage, and extended it to this space, which he is entitled to do. He is under no obligation to run the press pool the way it has historically been run. Thank you both very much. The case is submitted.
judges: Pillard; Katsas; and Rao